UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STATE AUTO PROPERTY & CASUALTY
INSURANCE COMPANY, INC.,

    Plaintiff,

  v.

ANTHONY BLAIR, JR.,

    Defendant.

No. 15 C 8026

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

State Auto Property & Casualty Insurance Company Inc. ("State Auto") seeks a declaratory judgment that it properly denied coverage under the homeowner's insurance policy it issued to Anthony Blair Jr. for the loss of his house to a fire. R. 1. State Auto has filed a motion for summary judgment arguing that Blair made material misrepresentations and false statements during State Auto's investigation of the fire. R. 109. For the following reasons, the motion is denied.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir.

2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

Under Blair's policy with State Auto, no coverage will be provided if the insured has "intentionally concealed or misrepresented any material fact or circumstance," "engaged in fraudulent conduct," or "made false statements." R. 112-4 at 35. State Auto argues that Blair made the following material misrepresentations or false statements: (1) he falsely testified during the investigation about the circumstances under which he purchased his house; (2) he made misrepresentations about whether he operated his business out of his house; and (3) he concealed information and made false statements—particularly in the Proof of Loss documents he submitted—about the rent he paid in the wake of the fire.

The Seventh Circuit has explained the standard for such a claim on summary judgment as follows:

> Concealment and fraud provisions in insurance policies have been enforced by both Illinois state courts and federal courts, including this court. . . . [G]iven such contract provisions, when an insured willfully makes false statements in proofs of loss with intent to deceive the insurer, the insured cannot recover any amount. If a false

> statement is knowingly made . . . with regard to a
> material matter, the [insured's] intent to defraud will be
> inferred since the law presumes "every man to intend the
> natural consequences of his acts.
> . . . .
> Ordinarily, the defense of fraud and false swearing
> presents a question of fact for the jury, but it becomes a
> question of law when the insured's misrepresentations
> cannot be seen as innocent. Intent to deceive must be
> present to find fraud. This intent can be inferred when a
> person makes a statement knowing it to be false where
> the statement was made for the purpose of inducing one
> to whom the statement is made to act. In cases where
> courts have found fraud as a matter of law, however, they
> have not automatically inferred fraudulent intent merely
> because an insured made a statement that is later shown
> to be false. Illinois courts have observed that intent to
> defraud should not be presumed and that the trier of fact
> should make all reasonable allowance for lack of
> knowledge or sound judgment or for honest mistake on
> the part of the insured as well as for the tendency to
> believe that which is to one's own interest. Accordingly,
> courts have inferred fraudulent intent as a matter of law
> only where viewing the evidence in the light most
> favorable to the insured, the court determines that any
> reasonable jury would find that the insured knowingly
> made false statements or willfully sought to defraud the
> insurer by misrepresentation.

*Trzcinski v. Am. Cas. Co.*, 953 F.2d 307, 313-14 (7th Cir. 1992) (internal citations

and quotation marks omitted).

Additionally, a "misrepresentation is material if reasonably careful and

intelligent persons would regard the facts as stated to substantially increase the

chances of the event insured against, so as to cause a rejection of the application."

*Methodist Med. Ctr. of Illinois v. Am. Med. Sec. Inc.*, 38 F.3d 316, 320 (7th Cir.

1994). "Although the materiality of a misrepresentation is ordinarily a question of

fact, summary judgment is appropriate where the misrepresentation is of such a

nature that no one would dispute its materiality." *Id.* In the context of a claim investigation, "[f]alse sworn answers are material if they might have affected the insurer's action or attitude, or if they may be said to have been calculated to discourage, mislead, or deflect the insurer's investigation in any area that might have seemed to it, at that time, a relevant area to investigate." *Passero v. Allstate Ins. Co.*, 554 N.E.3d 384, 388 (Ill. App. Ct. 1st Dist. 1990); *see also Barth v. State Farm Fire and Cas. Co.*, 886 N.E.2d 976, 981-82 (Ill. 2008).

### 1.    Circumstances of Purchase

Regarding his purchase of the house, Blair testified that he saw the house while driving along the highway and purchased it from the bank for $8,000. R. 113 ¶¶ 20-21. But he actually acquired the home when his grandmother gave him a quitclaim deed in exchange for three payments of $8,000. *Id.* ¶¶ 23, 27. When confronted with the quitclaim deed, Blair said he had been confused because the transaction was eight years ago, and he had received a number of other properties from his grandmother. R. 118 ¶ 24.

One would think Blair would remember the circumstances of his acquisition of the house. On the other hand, he had no reason to lie about this information. It is undisputed that Blair owns the house, and State Auto does not contend that the purchase price is relevant to its coverage decision. Furthermore, there is no conceivable reason for Blair to *under*value the house. Absent a readily apparent motive to lie, the Court holds that a reasonable jury could find that Blair had no

4

intent to deceive when he gave incorrect testimony about how he acquired the house. *See Trzcinski*, 953 F.2d at 313.[1]

### 2. Conducting Business

Blair owns a business selling printed materials, such as posters, flyers, and t-shirts. Blair testified that "he did not conduct business" at his house, R. 113 ¶ 37, and that he rented an office space to conduct sales of printing services that he outsourced to other printers, *id.* ¶¶ 29-30. State Auto argues that no reasonable jury could believe Blair's assertion that he did not conduct business at the house because it is contradicted by the following undisputed facts: (1) Blair kept four or five commercial printing machines in the basement; (2) Blair testified he used at least one of the machines to make t-shirts; (3) there were blank t-shirts in the basement; (4) there were bottles of paint in the basement; (5) there was blank paper and vinyl in the basement; (5) there was office furniture in the basement; (6) Blair displayed advertising outside the house; (7) there was a drop box on the house's fence; (8) the house's address was the address listed with the Illinois Secretary of State for his business; and (9) the house address was associated with the business's phone number. R. 113 ¶¶ 31-49.

---

[1] Blair also argues that the circumstances of his purchase of the house are not material because "State Auto has made no showing that the purchase price was material to its coverage decision." R. 115 at 9. But materiality is determined with reference to the investigation, not the coverage decision itself. *See Passero*, 554 N.E.3d at 388; *Barth*, 886 N.E.2d at 981-82. While the purchase price might not be entirely material, whether Blair, the insured, actually owns the house is certainly relevant and material to the investigation.

Blair does not dispute these facts on this motion, and he did not testify to the contrary during the investigation. In fact, his testimony included reasonable explanations for these facts. He testified that only one of the printers in the basement worked, and he used it to print t-shirts for neighborhood events as a hobby. R. 113 ¶ 36, 38. He admitted that he took business phone calls and received some business shipments at his home, *id.* ¶¶ 45, 53, but that he rented an office space to meet clients and conduct regular business, *id.* ¶ 54. He explained that he posted advertising outside his house because it was immediately adjacent to the expressway where it would be seen by drivers. *Id.* ¶ 43. He registered his home address with the Illinois Secretary of State because he was unsure how permanent his office lease would be. *See* R. 112-3 at 8 (183:10-21). Similarly, the business phone was registered at the house, but is a phone number Blair used prior to owning the house and continues to use even though he no longer lives in the house. R. 118 ¶¶ 17-19. Blair argues further in his brief that the volume of his business is much greater than any of the materials in the basement could support. *See* R. 115 at 11-12.

Although State Auto surmises that the contents of the house and Blair's activities there mean that Blair must have been conducting his business out of the house, this is simply not the only reasonable conclusion. Many people conduct some aspect of their business from their home. Taking calls, receiving packages, even posting advertisements, are not particularly extraordinary activities, and they do

not necessarily indicate that a residence is also a primary business location. Blair's explanations are plausible.

Additionally, it is not clear what the threshold of materiality is from State Auto's perspective. State Auto never explains what it means by "conducting business," or what kind of business conduct at the house would be material to its risk assessment for the policy. State Auto has not pointed to a definition of "conducting business" in any of the relevant policy documentation that would permit the Court to assess materiality as a matter of law.

On the question of whether Blair misrepresented that he "conducted business" in his house, the undisputed facts and Blair's testimony are not necessarily inconsistent. Therefore, a jury must decide whether Blair made any material misrepresentations, and if so, whether those misrepresentations were intentional.

### 3. Living Expenses

Lastly, State Auto argues that Blair made false statements about his living expenses after the fire. Specifically, Blair testified that he was leasing space in his grandmother's house for $470 per month. R. 113 ¶ 56. He produced rent receipts from his grandmother for $475 per month. *Id.* ¶ 62. He never provided a copy of a lease. *Id.* ¶ 66. State Auto argues that all of this evidence is contradicted by the Proof of Loss prepared by an agent from Nationwide Insurance Company Blair hired for that purpose, claiming $4,500 a month in living expenses. *Id.* ¶ 69.

7

The discrepancies between Blair's and his grandmother's testimonies do not necessarily indicate an intent to deceive. The difference in rental amount is too small, and it is entirely reasonable and unsurprising that family members would use the term "lease" in an informal sense.

Furthermore, there is a genuine fact dispute regarding Blair's intent to seek $4,500 per month in living expenses from State Auto. The evidence relevant to this issue is Blair's testimony and the testimony of the agent he hired to prepare the Proof of Loss. Blair testified that he could not remember whether he saw the Proof of Loss document before his agent submitted it to State Auto, or whether he even authorized the agent to submit the Proof of Loss. *See* R. 118 ¶¶ 7-9.

The agent's testimony is entirely ambiguous as to how he determined the claim for $4,500 per month. But it tends to show that the agent did not base the claim for $4,500 per month on Blair's actual rent:

> Q. Do you remember how you got the temporary rent amount of $4,500 a month?
>
> A. I don't remember how I got exact [sic], but it was given to me—either he was at a place already—I am not sure how I got that information. But it must have been a temporary lease. I am not sure exactly. But it was calculated at 4,500 a month, with furniture I am assuming.
>
> Q. And that was for 14 months?
>
> A. I took it—that's correct.
>
> Q. You are saying the amount of the monthly expense wouldn't have been a calculation—strike that—wouldn't have been a number that you would have chosen by yourself. It would have had some input from Mr. Blair?

8

A. No, not saying Mr. Blair. I mean some of it could have been from Mr. Blair. But some it could be from, you know, the office how long would it take to reconstruct the property, you know. If there was no delays or anything in that matter, temporary rent could have been already, a lease or something agreed on, you know. I don't have all the details here. And that's how that's come about.

*       *       *       *

Q. So back to what you were saying about moving in and not having any money. But if he testified that he paid his grandmother money to live there as rent, would that change your opinion as to the estimate for alternate living expenses?

A. No. Because you see what he paid, I don't know what he paid her. It indicates some amount. It's what he was able to pay. It's not the same as what he can afford. I mean for what he was entitled to.

Q. So you are saying that you believe he is entitled to $4,500 per month for rental expenses?

A. No. I'm saying that he is entitled to like-kind quality of a home that he had that burned. And I have seen many ALE claims come through and what the rental goes with furniture. It's around 2,000 to 3,500 a month usually. When they have a temporary rental place and it's three or four-bedroom lease, at least three bedrooms at least, so in order to rent that on a temporary facility with insurance that I have seen it's always around 3,000 up.

Q. What is your understanding in general that insurance companies will pay more to an insured for rental expenses that they are actually incurring?

A. No, no. No, that's not what I am saying.

Q. Back to the amount $4,500 though. I am still not understanding where it came from if you don't recall seeing any letter of a lease for 4,500. And it sounds to be more than what you typically would see for a fully furnished three to four-bedroom home.

9

A. I can't tell you where I got that number from.

Q. But is it your testimony then that that's what you believe that he is owed of like-kind?

A. Yes. I mean—if he had three-bedroom house, like-kind quality, would put him in a place, and if it's a rental is going there at that rate for the time that he is to rebuild the place, he should be entitled that. I mean if this claim was not denied and he was put in a place, they would put him in a temporary home, easily.

Q. But you believe it was denied?

A. Oh, yeah.

Q. How do you typically figure out the like-kind amount for monthly rent?

A. Well, I don't actually do that. I don't. But I've seen a lot of claims come through and I have I seen rental, temporary rental leases.

Q. Understand. Do you know how that amount is typically figured?

A. Well, from my understanding they look at corresponding neighborhoods. And temporary rental places cost a whole lot more than a four-year rental or, you know. When you rent something for six months or three months, it's maybe double or two times as much, plus you have to add furniture.

Q. So you don't calculate the number?

A. No, I didn't calculate that particular

Q. Do you recall why you have 14 months instead of 12 months or eight months?

A. Yeah, I probably put the time limit on some kind of investigation process. I mean I don't know what the policy limit was here. I mean as far as time, if it wasn't no time

limits, sometimes the policies put a 12-month limit. I am not sure if that was the case. But it's a dollar amount limit.

Q. Understand. And you are saying the 14 months you were counting for repair and investigation time?

A. Yeah.

R. 114-2 at 11-13 (37:17–38:15, 43:1–45:24). Based on this testimony, a reasonable juror could find that Blair's agent calculated the $4,500 in additional living expenses based on the market rent of Blair's burned down house, including the value of the furniture, and that he did not believe that Blair's actual rent was relevant to this calculation. A reasonable juror could also find that Blair had no actual knowledge of the agent's decisions, and even if he did, that he believed the agent was correct about the proper method of calculation (i.e., using the market value of the house, not the actual rent Blair was paying). Only a jury can decide who is telling the truth, and whether inaccurate testimony constitutes the intent to deceive necessary for State Auto to prevail.

## Conclusion

For the foregoing reasons, State Auto's motion for summary judgment, R. 109, is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  August 27, 2018

11